IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| Osvaldo de la Fuente and Victor Hugo Tapia Romero | ) <br> ) <br> ) Civil Action File No. |
| Plaintiffs, | ) 4:22-cv-00256-WMR <br> ) |
| v. | ) **FIRST AMENDED COMPLAINT –** <br> ) **CLASS ACTION** |
| Columbia Recycling Corp. and Gold Pond Corp. | ) <br> ) <br> ) |
| Defendants. | ) <br> ) **JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

COME NOW, Plaintiffs Osvaldo de la Fuente ("Osvaldo") and Victor

Hugo Tapia Romero ("Victor") (collectively, "Plaintiffs"), by and through their

counsel, and bring this First Amended Complaint for damages against

Defendants Columbia Recycling Corp. and Gold Pond Corp. (collectively,

"Defendants").

### I.      Introduction

1.      This case involves visa fraud and Defendants' false promises to

Plaintiffs and other highly skilled Mexican engineers that they would be

employed in high paying and high skilled engineering jobs in the United States under the TN visa program.

2.    Plaintiffs and similarly situated Mexican engineers relied on these false promises, secured TN visas, and travelled to the United States, to begin the promised work at the Defendants' recycling facility in Dalton, Georgia.

3.    On arrival at the job site, Plaintiffs and other highly skilled Mexican engineers learned that the job promises were false.  They were required to perform manual labor rather than the promised engineering jobs.  They were paid low hourly wages rather than the higher salary wages promised.  They were required to work excessive hours, subjected to terrible working conditions, and victimized by illegal wage practices.

4.    The manual labor and low pay imposed on Plaintiffs and other Mexican engineers violated the terms of their TN visas.

5.    Further, because Defendants required all laborers—not just the TN visa holders—to pay for their own tools, personal protective equipment, and drinking water, all laborers at the recycling facility suffered violations of their right to be paid overtime wages without illegal deductions.

6.    Defendants also cheated Plaintiffs, other engineers, and the U.S. Internal Revenue Service by filing false informational tax returns that failed to report the wages (and applicable withholdings) they paid to the engineers.

7.    For these reasons, Plaintiffs bring collective action claims for violations of the overtime provisions of the Fair Labor Standards Act ("FLSA") and class action claims (a) for Defendants' violations of the Georgia Racketeer Influenced and Corrupt Organizations Act; (b) for Defendants' violations of the terms of Plaintiffs' and other TN visa holders' employment contracts; and (c) for Defendants' filing of false information returns with the U.S. Internal Revenue Service.

8.    Defendants retaliated against Plaintiff Osvaldo when he complained about his low wages by assigning him to the most dangerous and undesirable job at the plant.

9.    Therefore, Plaintiff Osvaldo brings an individual claim for Defendants' violations of the FLSA's anti-retaliation protections.

**II.    Jurisdiction and Venue**

10.    The Court has subject matter jurisdiction over the FLSA and Internal Revenue Code claims in this action because they arise under federal statutory law.[1]

11.    The Court has jurisdiction over Plaintiffs' pendant state law RICO and contract claims because they are part of the same case or controversy as Plaintiffs' federal claims.[2]

**III.    Parties**

12.    Plaintiffs are residents of Kentucky. They submit themselves to the jurisdiction of this Court.

13.    Plaintiff Osvaldo came to Georgia from Mexico on a TN visa in late May 2022. He started working for Defendants on or about May 31, 2022.

14.    Plaintiff Osvaldo holds a Bachelor of Science in Electronics Engineering.

15.    Plaintiff Victor came to Georgia from Mexico on a TN visa in mid-June 2022.  He started working for Defendants on or about June 18, 2022.

16.    Plaintiff Victor holds a Bachelor of Science in Industrial Engineering.

---

[1]  *See* 28 U.S.C. § 1331.
[2]  *See* 28 U.S.C. § 1367

17.    At all relevant times, Plaintiffs and other similarly situated workers were employees of Defendant Gold Pond.

18.    At all relevant times, Plaintiffs and other similarly situated workers were employees of Defendant Columbia Recycling.

19.    At all relevant times, Plaintiffs and other similarly situated workers were not exempt from the overtime provisions of the FLSA.

20.    Plaintiffs have consented in writing to become party Plaintiffs in this action for claims under the FLSA.  *See* R. Doc. 3-1.

21.    At all relevant times, Plaintiffs and other similarly situated employees were each a "person injured by reason of any violation of [O.C.G.A.] Section 16-14-4," as set forth in the Georgia RICO.[3]

22.    Defendant Columbia Recycling Corp. is a domestic for-profit corporation with its principal office in Dalton, Georgia.

23.    The officers of Columbia Recycling Corp. are CEO Robert G. Goldberg, CFO Phillip M. Goldberg, and Secretary Sharon K. Ponders.

24.    Defendant Gold Pond Corp. is a domestic for-profit corporation with its principal office in the Dalton, Georgia.  Gold Pond Corp. directed earnings statements and payments to be issued to Plaintiffs.

---

[3] See O.C.G.A. § 16-14-6(c).

25.     The name "Gold Pond Corp." is derived from the names of its officers: CEO Robert G. Goldberg, CFO Phillip M. Goldberg, and Secretary Sharon K. Ponders.

26.     At all relevant times, Columbia Recycling Corp. and Gold Pond Corp. both controlled the terms and conditions of Plaintiffs' employment, their work schedules, and pay.  Both Defendants were "employers" of Plaintiffs and other similarly situated workers within the meaning of the FLSA.

27.     Defendants are an enterprise engaged in commerce or in the production of goods for commerce.

28.     Defendants have a gross volume of sales made or business done of not less than $500,000 per year.

**IV.    The RICO Enterprises.**

29.     Defendant Columbia Recycling Corp. and Defendant Gold Pond Corp. were an enterprise ("RICO Enterprise I") within the meaning of that term as defined by the Georgia RICO in that they were associated in fact although not a legal entity or, alternatively, in that they were an unchartered association.[4]

30.     Both Defendants were associated with RICO Enterprise I.

---

[4] *See* O.C.G.A. § 16-4-3(3).

31.     Defendant Columbia Recycling Corp., Defendant Gold Pond Corp., and Total Employee Solution Support, LLC ("TESS") were an enterprise ("RICO Enterprise II") within the meaning of that term as defined by the Georgia RICO in that they were associated in fact although not a legal entity.[5]

32.     Both Defendants were associated with RICO Enterprise II.

33.     RICO Enterprise I and RICO Enterprise II will be referred to herein collectively as the "RICO Enterprises."

**V.    Background and Structure of the TN Visa Program.**

34.     The North American Free Trade Agreement ("NAFTA"), which came into force on January 1, 1994, created a special trade relationship between the United States, Mexico, and Canada.[6]

35.     The U.S. government created the TN nonimmigrant classification, commonly known as the TN visa, to permit Mexican and Canadian professionals in certain occupations ("TN profession") to temporarily enter the United States for employment within their profession.[7]

---

[5] *See Id.*

[6] *See generally,* North American Free Trade Agreement, Can.-Mex.-U.S., Dec. 17, 1992, 32 I.L.M 289 (1993).

[7] *See* 8 C.F.R. § 214.6(a).

36.     Engineers are among the categories of professionals permitted entry

into the United States with TN visas.[8]

37.     A Mexican citizen applying for a TN visa:

must present documentation sufficient to satisfy the consular officer …
that the applicant is seeking entry to the United States to engage in
business activities for a United States employer(s) or entity(ies) at a
professional level, and that the applicant meets the criteria to perform at
such a professional level. This documentation may be in the form of a
letter from the prospective employer(s) in the United States or from the
foreign employer, and must be supported by diplomas, degrees or
membership in a professional organization…The documentation shall
fully affirm:

(A) The [TN] profession of the applicant;

(B) A description of the professional activities, including a brief summary
of daily job duties, if appropriate, in which the applicant will engage in
for the United States employer/entity;

(C) The anticipated length of stay;

(D) The educational qualifications or appropriate credentials which
demonstrate that the … Mexican citizen has professional level status; and

(D) The arrangements for remuneration for services to be rendered.[9]

38.     The TN visa applicant "must engage in a prearranged business

activity at a professional level for a U.S. or foreign employer."[10]

---

[8] *See* 8 C.F.R. § 216.4(c) (incorporating Appendix 1603.D.1 to Annex 1603 of the
NAFTA).
[9] 8 C.F.R. § 214.6(d)(3)(ii).
[10] 9 F.A.M. § 402.17-5(A).

39.    The offered salary must be "indicative of professional-level employment in the United States."[11]

40.    Once an applicant has provided the required evidence set forth in the preceding paragraphs, the applicant is admitted under the TN nonimmigrant visa classification for a period of up to three years.[12]

41.    The TN visa is tied to the associated employer for the duration of the TN visa period unless the TN visa holder submits a verified petition to USCIS seeking to add or change employers.[13]

42.    Since 1997, the number of TN visas issued has increased significantly every year, with the exception of 2020 due to the COVID-19 pandemic.  For example, in 1997, 287 TN visas were issued to Mexican

---

[11] 9 F.A.M. § 402.17-6(c)(2)(a).

[12] *See* 8 C.F.R. § 214.6(e).

[13] 9 F.A.M. § 402.17-5(A)(7) (the petitioner must file a Form I-129, Petition for Nonimmigrant Worker).

nationals.[14]  By 2007, the number had increased to 4,060.[15]  In 2017, it had grown

to 15,993 visas;[16]  In 2021, 24,881 TN visas were issued to Mexican nationals.[17]

43.    Oversight of TN visa holders' working conditions in the United

States is largely unregulated.  As a consequence, there have been multiple

---

[14] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 1998), Statistics/NIVDetailTables/FY1998_NIV_Detail_Table.pdf (last viewed March 25, 2022).

[15] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2007), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY07NIVDetailTable.pdf (last viewed March 25, 2022).

[16] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2017), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY17NIVDetailTable.pdf (last viewed March 25, 2022).

[17] *See* Nonimmigrant Visas Issuances by Visa Class and Nationality, U.S. Department of State (FY 2021), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY21NIVDetailTable.pdf (last viewed Oct. 23, 2022).

reports of abuses—including misrepresentations in employment contracts—of TN visa workers,[18] as well as several lawsuits.[19]

**VI.**     <u>Facts</u>

    *a. RICO Fraud Claims*

44.     The Defendants conducted or participated in RICO Enterprise I and/or RICO Enterprise II, through the acts and omissions set forth in paragraphs 45-87 and paragraph 111, below, which constituted a pattern of racketeering activity.

45.     On or about October 21, 2021, Defendants, through labor recruiter TESS, provided a job offer letter ("job offer") to Plaintiff Victor (attached hereto as Exhibit A).[20]

46.     The job offer was on "Columbia Recycling Corporation" letterhead and was signed by Shannon Warnix, "Human Resources."

---

[18] Coerced under NAFTA: Abuses of Migrant Workers in the TN Visa Program and Recommendations for Reform, Centro de los Derechos del Migrante (Dec. 2017), https://cdmigrante.org/wp-content/uploads/2018/01/Coerced-under-NAFTA_-Abuses-of-Migrant-Workers-in-TN-Visa-Program.pdf (last viewed March 25, 2022).

[19] *See, e.g., Martinez-Rodriguez v. Giles*, 31 F.4th 1139 (9th Cir. 2022); *Castellanos v. Wordlwide Distribution Sys. USA, LLC,* No. 2:14-CV-12609, 2016 WL 11678220, at *8 (E.D. Mich. June 20, 2016)

[20] For the purpose of this pleading, the Plaintiffs' addresses in Mexico have been redacted from the job offers.

47.    At the time Shannon Warnix signed the offer letters, she was Defendants' employee acting under Defendants' express authority.

48.    Defendant Columbia Recycling indicated the terms and conditions of Plaintiff Victor's employment, "per our agreement," would be:

    a.  employment as an Industrial Engineer;

    b.  an annual salary of "**$38,500 plus overtime and monthly bonus**" (emphasis in original); and

    c.  One month housing and transportation support.

49.    On or about April 20, 2022, Defendants provided a nearly identical job offer to Plaintiff Osvaldo (attached hereto as Exhibit B).

50.     The only difference between the offers was the date and the job title. Plaintiff Osvaldo was to work as an Electronics Engineer, rather than as an Industrial Engineer.

51.    Between September 2021 and August 2022, Defendants provided substantively identical job offers – the only difference being the dates and the types of engineers in the job title – to dozens of engineers in Mexico.

52.    Defendants sent the job offers to Georgia-based TESS by mail or wires, and TESS then transmitted the job offers to the Plaintiffs and other engineers in Mexico by mail or wires.

53.     At the time the Defendants signed and sent the job offers, they knew the Plaintiffs and other engineers in Mexico would not earn "$38,500 plus overtime and monthly bonus."

54.     At the time the Defendants signed and sent the job offers, they knew the Plaintiffs and other engineers in Mexico would not be employed as engineers, but rather would perform manual labor.

55.     The purpose of the fraudulent job offers was to entice the Plaintiffs and other workers to accept engineering jobs at Defendants' operations, though these jobs did not exist.

56.     Plaintiffs and other similarly situated TN visa holders accepted the job offers in reliance on the Defendants' misrepresentations.

57.     At the same time the Defendants transmitted the job offers, the Defendants sent support letters to Plaintiffs and other engineers in Mexico.

58.     Defendants provided the support letters to comply with the TN visa documentation requirements set forth in 8 C.F.R. § 214.6(d)(3)(ii), and they were addressed to the United States Embassy or U.S. consulates in Mexico.

59.     Plaintiff Victor's support letter (attached hereto as Exhibit C), which he received on or about October 21, 2021, was on "Columbia Recycling

Corporation" letterhead and was signed by Shannon Warnix, "Human

Resources."

      60.    The Defendants' support letter for Plaintiff Victor indicated, *inter*

*alia*:

> a.  He will hold the internal job title of Industrial Engineer as a full-time employee will have the opportunely to work overtime at will. On average our employee's earn a of minimal annual salary of $38,500.00 plus a standard employee benefits package (housing and transportation).
>
> b.  The position offered is professional and specialized in nature and falls within the schedule of permitted TN occupations - Engineer - authorized by NAFTA.
>
> c.  As an Industrial Engineer, Mr. Victor Hugo Tapia Romero will utilize his academic background in Industrial Engineering and his professional background to work closely with fellow engineers, technicians and machinists to eliminate wastefulness in production processes and devise efficient systems that integrate workers, machines, materials, information, as well as auxiliary systems to support the overall engineering of various processes of CRC.
>
> d.  His main duties will include the following:
> • Improve current production processes to manufacture products, using applicable methods and procedures;
> • Develop standardized work instructions so operators can perform work safely, with the proper quality and in the proper time;
> • Provide engineering expertise in developing a range of engineering solutions to improve the manufacture of new and existing CRC's processes;

     • Analyze and determine best equipment setup and process flow for maximizing fabrication of parts within a high-volume manufacturing environment;

     • Apply automated solutions to the transfer of materials, components, or finished goods;

     • Apply mathematical analysis to determine validity and reliability of sampling and work statistics;

     • Plan and schedule Manufacturing Orders to be completed in a timely manner by analyzing production capacities and scheduling all orders in the injection machines in a way that minimizes labor while decreasing the lead time to customers;

     • Monitor, analyze, and prepare weekly production reports and reports them to the Operations Manager with suggested ideas to improve production efficiencies; and

     • Support Production engineers and management staff by assisting in daily challenges that occur and also by managing inventory and completing projects as required to help control operating expenses.

e. Mr. Victor Hugo Tapia Romero is qualified for TN status as an Industrial Engineer for the following reasons: …
     •The employment offered to Mr. Victor Hugo Tapia Romero in is at a specialized level;
     •He possesses the requisite professional qualifications to perform the duties at a professional level. …

f. In conclusion, we respectfully request that the U.S. consul grant Mr. Victor Hugo Tapia Romero the TN classification as Industrial Engineer so he can work on a temporary basis in the United States.

61.    The support letter also provided Columbia Recycling's telephone number and indicated the U.S. Embassy representative should call that number if they "require any additional information or documentation…"

62.    The Defendants' support letter for Plaintiff Osvaldo (attached hereto as Exhibit D), which he received on or about April 10, 2022, was identical to Plaintiff Victor's support letter, with the exception of the job title (Electronics Engineer) and job description.

63.    The job description in Plaintiff Osvaldo's support letter indicated, *inter alia*:

    a.  As an Electronics Engineer, Mr. Osvaldo De la Fuente Ruiz will utilize his academic background in Electronics Engineering and his professional background to work closely with fellow engineers, technicians and machinists to eliminate wastefulness in production processes and devise efficient systems that integrate workers, machines, materials, information, as well as auxiliary systems to support the overall engineering of various processes of CRC.

    b.  His main duties will include the following:
        • Develop electronic schematics & panel design and control system design solutions based on engineering principles and prototypes for automobile industrial applications;
        • Analyze project requirements and perform technical calculations supporting design including electrical & electronic requirements, robotic safety standards;
        • Evaluate electrical & electronic control systems, prototypes and proposals and recommend design modifications to eliminate causes of malfunctions or changes in system requirements;
        • Develop and maintain procedures for maintaining complex automated test equipment, new capability development, and process improvement;
        • Make adjustments to control system parameters to bring system into specifications or to improve performance;

• Inspect electronic equipment systems to ensure conformance to specifications, safety standards, and applicable codes and regulations;
• Plan and develop applications and modifications for electronic properties used in parts and systems to improve technical performance; and
• Manage manufacturing documentation required for product manufacturing, i.e., revise drawing, accurate work instructions and workmanship standards and process procedures.

64.     Between September 2021 and August 2022, Defendants sent substantively identical support letters – the only difference being the dates, the job titles, and aspects of the job descriptions – to dozens of engineers in Mexico.

65.     The support letters were fraudulent in that they falsified the amounts that Plaintiffs would be paid, their job titles and their job duties.

66.     At the time the Defendants signed and sent the support letters, they knew the Plaintiffs and other Mexican engineers would not be employed as engineers.

67.     At the time the Defendants signed and sent the support letters, they knew the Plaintiffs and other engineers in Mexico would not perform the job duties listed in the letter.

68.     At the time the Defendants signed and sent the support letters, they knew the jobs Plaintiffs and other engineers in Mexico would perform did not require the skills, education, and experience Defendants indicated the candidates

would need.  Rather, the Defendants knew the Plaintiffs and other Mexican engineers would perform unskilled and low-skilled manual labor that did not require a college degree of any kind, let alone an engineering degree.

69.    At the time the Defendants signed and sent the support letters, they knew the Plaintiffs and other engineers in Mexico would receive the wages set forth in the letter.

70.    The Defendants transmitted the support letters to Georgia-based TESS by mail or wires, and TESS then transmitted the support letters to Plaintiffs and other engineers in Mexico by mail or wires.

71.    Defendants, through their agents, directed Plaintiffs and other Mexican engineers to provide the support letters to U.S. government in support of the engineers' TN visa applications.

72.    The purpose of the fraudulent support letters was to get TN visas for Mexican engineers to perform manual labor at Defendants' operations.

73.    Plaintiffs and other Mexican engineers did not know the support letters were fraudulent because, among other things, they were consistent with the job offers Plaintiffs and other Mexican engineers had accepted.

74.    In reliance on the fraudulent job offers and Support Letters, Plaintiffs and other similarly situated workers:

      a.  paid U.S. government visa fees and travel costs from their homes to and from consular interviews in Mexico;

      b.  secured TN visas;

      c.  traveled to the United States, to work for Defendants;

      d.  worked for Defendants, earning wages that were lower than the wages Defendants promised in the job offers;

      e.  spent money on furniture and other items for employer-provided apartments;

      f.  spent money on rent for the employer-provided housing after the first month;

      g.  spent money on transportation costs between the employer-provided housing and the worksites after the first month; and

      h.  purchased tools of the trade the employer required for their jobs.

75.   The Defendants' fraudulent job offers and support letters caused and/or proximately caused the Plaintiffs and other Mexican engineers to suffer economic injuries, including the expenses and losses set forth in the preceding paragraph.

b.    *Contract Claims*

76.    The job offers, which Plaintiffs and other similarly situated workers accepted, were contracts under Georgia law.

77.    The parties were able to contract.

78.    There was consideration moving the contracts.

79.    The parties assented to the terms of the contracts.

80.    There was a subject matter upon which the contracts could and did operate.

81.    Defendants violated the contracts by failing to employ Plaintiffs and other similarly situated workers as engineers.

82.    Defendants violated the contracts also by failing to pay Plaintiffs and other similarly situated workers an annual salary of "$38,500 plus overtime and monthly bonus."

83.    A salary of $38,500 for non-overtime work is the equivalent of $18.51 per hour ($38,500 ÷ 52 weeks ÷ 40 hours).

84.    Defendants paid Plaintiffs and other similarly situated workers a regular rate of pay of $13.00 per hour. This is $5.51 per hour less than the promised contract rate.

85.     At the agreed-to contract rate of $18.51 per hour, Defendants should have paid Plaintiffs and other similarly situated workers overtime wages at the rate of $27.76 ($18.51 x 1.5).

86.     Defendants paid Plaintiffs and other similarly situated workers an overtime rate of $19.50 per hour, which is $8.26 less than the overtime rate Defendants were required to have paid Plaintiffs based on the promised salary "plus overtime and monthly bonus" set forth in the job offer.

87.     By failing to pay Plaintiffs and other similarly situated workers the promised wage rate, Defendants breached the contracts.

c.      *FLSA Overtime Claims*

88.     During the first month of employment, Defendants paid Plaintiffs' and other similarly situated workers' rent for apartments Defendants provided.

89.     During the first month of employment, Defendants paid Plaintiffs' transportation costs from the employer-provided housing to Defendants' worksite.

90.     Defendants paid Plaintiffs and other similarly situated workers a $100 "bonus" if they worked more than 72 hours in a workweek.  This was a nondiscretionary bonus within the meaning of the FLSA and its implementing regulations.

91.     Plaintiffs and other similarly situated workers were required to purchase tools of the trade such as drills, pliers, and screwdrivers for use at Defendants' carpet recycling plant, as well as bottled drinking water (despite the hot temperatures in the plant, Defendants did not provide free drinking water to their employees).

92.     Defendants also required Plaintiffs and other similarly situated workers to buy personal protective equipment, such as gloves, safety goggles, masks, and aprons, directly from the Defendants.

93.     Plaintiffs purchased these tools of the trade, safety equipment, and bottled drinking water on behalf of or for the benefit or convenience of Defendants.

94.     Defendants did not reimburse Plaintiffs and other similarly situated workers for expenses incurred by Plaintiffs and other similarly situated workers primarily for the benefit or convenience of the employer, such that the expenses cut into mandatory overtime pay requirements of the FLSA.

95.     In violation of the FLSA, Defendants did not pay Plaintiffs and other similarly situated workers overtime at the rate of one-and-one-half times the regular rate of pay promised in Defendants' job offers and which Defendants

were required to pay as a condition of the U.S. government's issuance of the TN visas.

96.    In violation of the FLSA, Defendants did not pay Plaintiffs and other similarly situated workers overtime wages at the rate of one-and-one-half times the regular rate of pay, including (a) the reasonable cost or the fair value of the housing and transportation Defendants provided to Plaintiffs and other similarly situated workers; and (b) the nondiscretionary bonuses Defendants paid to Plaintiffs and other similarly situated workers.

97.    In violation of the FLSA, the unreimbursed cost of the tools of the trade, the safety equipment, and the water Plaintiffs and other similarly situated workers purchased for use at Defendants' recycling plant cut into the overtime wages Defendants were required to pay to these workers.

      *d.    FLSA Retaliation Claims*

98.     Plaintiff Osvaldo complained to his supervisors and Defendants' human resources staff about Defendants' failure to properly pay overtime and the required wages.

99.    These complaints were statutorily protected conduct under the FLSA.

100.    In retaliation for lodging these complaints, Defendants required Plaintiffs Osvaldo to work in the section of Defendants' recycling plant where used carpet and carpet pads were ground into powder for repurposing. Defendants' employees, including Plaintiff Osvaldo, considered this to be the least desirable work assignment because of the heat; the carpet fiber powder that permeated the air, which made it difficult to breathe and exposed the workers to hazardous toxins; the strong stench of animal urine from the carpet pads; nails, tacks, and staples in the carpet and pads that punctured the workers' gloves; and the weight of the bales the workers had to process.  In a ten-hour shift, individual workers typically would have to grind between 4,500 and 6,000 pounds of material.

101.    In violation of the FLSA, Defendants retaliated against Plaintiff Osvaldo and other similarly situated workers who complained about their wages, including their overtime wage rates.

    *e.    Claims for False Information in Defendants' Tax Returns*

102.    Defendants submitted false information returns that failed to report Plaintiffs' and other similarly situated workers' wages (and withholdings) in quarterly and annual information returns Defendants filed with the U.S. Internal Revenue Service ("IRS"), or that intentionally failed to associate Plaintiffs' and

other similarly situated workers' wages (and withholdings) with their corresponding Social Security numbers in quarterly and annual information returns Defendants filed with the IRS.

103.    For example, though Plaintiffs were authorized to work in the United States and obtained valid Social Security numbers, but Defendants did not process their wages and withholdings using those Social Security numbers.

104.    Rather, Defendants paid Plaintiffs' wages and deducted payroll tax withholdings, but (1) omitted such wages and withholdings in Defendants' quarterly and annual information returns, or (2) reported the wages and withholdings to the IRS using falsified Social Security numbers.

105.    Upon information and belief, in January 2022, Defendants issued fraudulent W-2 forms on behalf TN visa holders underreporting their taxable earnings.

106.    Upon information and belief, in January 2023, Defendants issued fraudulent W-2 forms on behalf of Plaintiffs and other TN visa holders underreporting their taxable earnings.

107.    Upon information and belief, Defendants misrepresented  Plaintiffs' Social Security numbers on the fraudulent W-2 forms.

108.    On November 3, 2022, Plaintiff Osvaldo requested and received his earnings records from the U.S. Social Security Administration ("SSA").  The SSA records show no earnings or withholdings were reported for the time period when Plaintiff Osvaldo worked for Defendants.

109.    Plaintiffs, through counsel, requested their 2022 W-2 forms from Defendants, through counsel, on three separate occasions in February and March 2023. To date, the Defendants have not produced the W-2 forms.

110.    Defendants fraudulently and willfully submitted the Plaintiffs' and other TN visa holders' false information returns for the purpose of avoiding paying Defendants' share of their payroll tax obligations.

111.    Defendants, through RICO Enterprise I, similarly misrepresented Plaintiffs and other TN visa holders' wages in quarterly returns and other filings submitted to the Georgia Department of Revenue in 2021, 2022, and 2023.

112.    As a consequence of the false information returns, Plaintiffs and other TN visa holders suffered or will suffer economic damages, including tax preparer and/or accountant fees to correct the misrepresentations and penalties associated with the late payment of taxes on the unreported wages.

## VII.    FLSA Collective Action Allegations

113.    Plaintiffs bring their FLSA claims on behalf of themselves and those individuals who may opt into this action pursuant to 29 U.S.C. § 216(b) and who were not paid required overtime wages at Defendants' operations between November 18, 2019 and the date of preliminary approval of the opt-in class.

114.    Plaintiffs bring their FLSA collective action claims on behalf of three subclasses of workers:

  a.  FLSA Collective Action Subclass I: All TN visa holders employed by one or more Defendant who suffered underpayment of overtime at the rate of one-and-a-half times the regular rate of pay, including employer-provided transportation, housing, and non-discretionary bonuses.

  b.  FLSA Collective Action Subclass II: All TN visa holders employed by one or more Defendant who suffered underpayment of overtime at the rate of one-and-a-half times the mandated regular rate of pay in Defendant Columbia Recycling Corp.'s job offers.

  c.  FLSA Collective Action Subclass III: All non-supervisory employees employed by one or more Defendant who (a) were required to purchase tools of the trade, safety equipment, and/or drinking water, and (b) worked more than forty hours in any workweek.

115.    Plaintiffs and other TN visa holders in FLSA Collective Action Subclass I were subject to the same policies and practices of Defendants with respect to underpayment of overtime at the rate of one-and-a-half times the

regular rate of pay, including employer-provided transportation, housing, and non-discretionary bonuses.

116.    Plaintiffs and other TN visa holders in FLSA Collective Action Subclass II were subject to the same policies and practices of Defendants with respect to underpayment of overtime at the rate of one-and-a-half times the mandated regular rate of pay in Defendants' job offers.

117.    Plaintiffs and other employees of Defendants in FLSA Collective Action Subclass III were subject to the same policies and practices of Defendants with respect to the requirement that the employees purchase tools of the trade, safety equipment, and drinking water, the cost of which Defendants did not reimburse and which cut into Plaintiffs' and other employees' overtime wages.

118.    Common proof applicable to Plaintiffs and other similarly situated workers in FLSA Collective Action Subclasses I, II, and III will show that the Defendants failed to properly pay them overtime wages as required by the FLSA.

119.    Plaintiffs believe that there are hundreds of other similarly situated workers who suffered from Defendants' FLSA violations.  Plaintiffs are currently unaware of the identities of all the employees who would be members of the FLSA opt-in classes, but this information is readily ascertainable from the Defendants' records.  The Defendants therefore should be required to provide

Plaintiffs with a list – including last known addresses, telephone numbers, email addresses, and messaging (such as WhatsApp) contact information, if known – of all individuals who were non-supervisory employees of one or more Defendant.

**VIII.    Rule 23 Class Action Allegations**

120.    The Plaintiffs bring their Georgia RICO, contract, and Internal Revenue Code class action claims (Counts I, II, and III) pursuant to Fed. R. Civ. P. 23(b)(3) on behalf of themselves and a class of persons ("the Class") consisting of:

> All individuals who, between November 18, 2016 and the present, (1) received wages from one or more Defendant; and (2) were TN visa holders.

121.    Excluded from the Class are the legal representatives, officers, directors, assigns, and successors of Defendants; any individual who at any time during the class period has had a controlling interest in any Defendant; and all persons who submit timely and otherwise proper requests for exclusion from the Class.

*Numerosity*

122.    There are over 50 TN visa holders who are putative members ("members") of the Class in this action.

123.    The members of the Class are sufficiently numerous that joinder of all members is impractical.

*Existence and Predominance of Common Questions*

124.    Common questions of law and fact exist as to Plaintiffs and all members of the Class and predominate over questions affecting only individual Class members.

125.    These common questions include:

  a.    Whether Defendants were associated with RICO Enterprise I and/or RICO Enterprise II and, if so, whether Defendants conducted or participated in one or both enterprises through a pattern of racketeering activity;

  b.    Whether Defendants used the job offers and support letters as instrumentalities of a scheme or artifice to defraud TN visa candidates and the U.S. government;

  c.    Whether Defendants used the mail and/or wires in furtherance of the fraudulent scheme;

  d.    Whether the TN visa holders and/or the U.S. government relied on the fraud;

e.  Whether the TN visa holders suffered actual damages caused and/or proximately caused by their and/or the U.S. government's reliance on the fraud;

f.  Whether Defendants breached the terms of employment contracts with Plaintiffs and the Class members, including Defendants' promise (a) to employ Plaintiffs and the Class members as engineers; and (b) to pay Plaintiffs and the Class members $38,500 per year plus overtime and bonuses.

g.  Whether Defendants had a policy of failing to pay Plaintiffs and the other Class members as required by law;

h.  Whether Defendants induced Plaintiffs and the other Class members to enter their contracts by fraud;

i.  If fraud was present, whether the fraud constituted willful misconduct, malice, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

j.  Whether Defendants acted in bad faith when the breached their contracts with Plaintiffs and the other Class members.

k. Whether Defendants filed false information returns with the IRS with respect to the Plaintiffs' and other Class members' wages; and

l. The nature and extent of class-wide injury and the measure of damages for those injuries.

<u>*Typicality*</u>

126. Members of the proposed Class have all been subject to the same unlawful practices of Defendants, and their claims arise out of these same practices.

127. Plaintiffs and the proposed class members have the same rights under the Georgia RICO and Georgia contract law and entered contracts that were substantially the same.

128. Plaintiffs and the proposed class members performed similar work under similar circumstances giving rise to the same claims.

129. Plaintiffs and proposed class members suffered similar types of damages.

130. Plaintiffs' claims are typical of the claims of the Class because, among other things, Plaintiffs were employees who worked for the Defendants with TN visas and suffered the same violations as the proposed class members.

131.    Defendants' practices with respect to informational returns submitted to the IRS were the same with respect to Plaintiffs and the Class members.

132.    Plaintiffs' interests are co-extensive with the interests of the Class members; Plaintiffs have no interest adverse to the Class members.

*Adequacy*

133.    Plaintiffs will fairly and adequately represent the interests of the class members.   Their interests do not conflict with the interests of the members of the Class they seek to represent.

134.    Plaintiffs understand that, as Class representatives, they assume a responsibility to the class to represent its interests fairly and adequately.

135.    Plaintiffs have retained counsel experienced in prosecuting class actions and in employment matters.  There is no reason why Plaintiffs and their counsel will not vigorously pursue this matter.

*Superiority*

136.    A class action is superior to other available means for the fair and efficient adjudication of the claims at issue herein.

137.    The damages suffered by each individual Class member may not be sufficient to justify the burden and expense, particularly in light of the

transnational nature of this case, of individual prosecution of the litigation necessitated by Defendants' conduct.

138.    Further, it would be difficult for members of the Class to obtain individual redress effectively for the wrongs done to them. If individual actions were to be brought by each member of the Class, the result would be a multiplicity of actions, creating hardships for members of the Class, the Court, and the Defendants.

139.    The members of the Class are foreign nationals and migrant workers who lack the means and resources to secure individual legal assistance, have limited command of the English language or familiarity with the United States legal system, and are particularly unlikely to be aware of their rights to prosecute these claims.

140.    Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the Court system.

141.    By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

142.    This case does not present individualized factual or legal issues which would render a class action difficult.

143.    In the alternative, the Class may be certified because: (a) the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

**IX.    Causes of Action.**

<u>**Count I**</u>
<u>**Georgia RICO**</u>
**(Class Claim)**

144.    By this reference, Plaintiffs incorporate the above factual statements as if fully stated herein.

145.   This Count sets forth Plaintiffs' and Class members' claims for damages against Defendants caused by Defendants' violations of the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO").

146.   Each Plaintiff and Class member is an aggrieved person with standing to sue within the meaning of Georgia RICO, O.C.G.A. § 16-14-6(b).

147.   Each Plaintiff and Class member is a person who was injured by reason of violations of O.C.G.A. § 16-14-4. Therefore, Plaintiffs have standing to sue pursuant to Georgia RICO, O.C.G.A. § 16-14-6(c).

148.   Defendants are associated in fact although not a legal entity or, alternatively, an unchartered association, and therefore are a RICO enterprise (RICO Enterprise I) as defined above, within the meaning of O.C.G.A. § 16-14-3(3).

149.   Defendants and TESS are associated in fact although not a legal entity and therefore are a RICO enterprise (RICO Enterprise II), as defined above, within the meaning of O.C.G.A. § 16-14-3(3).

150.   The RICO Enterprises I and II, as defined above, are each an association-in-fact enterprise with the common purpose of securing cheap manual labor to work at Defendants' Dalton, Georgia facilities in violation of immigration laws, and to profit from such labor.

151.   Defendants acquired and/or maintained control of real and personal property, including land, buildings, motor vehicles, and property and money associated with the Defendants' recruiting, staffing, and manufacturing operations, through a pattern of numerous acts of racketeering activity in violation of O.C.G.A. § 16-14-4(a), related by their common purpose.

152.   The Defendants were employed by or associated with the RICO Enterprises and conducted or participated in the RICO Enterprises through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(b) and 16-14-4(c), related by their common purpose of securing cheap manual labor to work at Defendants' Dalton, Georgia facilities and to profit from such labor.

153.   Specifically, the predicate acts of racketeering activity by which the Defendants committed the Georgia RICO violations set forth in the preceding paragraphs, are the following:

    a.    Mail fraud in violation of 18 U.S.C. § 1341;

    b.    Wire fraud in violation of 18 U.S.C. § 1343;

    c.    Fraud in foreign labor contracting in violation of 18 U.S.C. § 1351;

    d.    Visa fraud in violation of 18 U.S.C. § 1546; and

    e.    False statements and writings, in violation of O.C.G.A. § 16-10-20.

154.    The Defendants used proceeds derived from the racketeering activity – and/or conspired to do so – to acquire and maintain interest in money.

*Predicate Acts*

Conduct Defined as "Racketeering"
Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343

155.    As set forth in the preceding paragraphs, Defendants, through the RICO Enterprises, made material misrepresentations to the U.S. government and to TN visa applicants regarding the nature of Plaintiffs' and other Class members' work and the wages they would receive.

156.    As set forth in the preceding paragraphs, the Defendants, though the RICO Enterprises, used the mails and wire communications, including communications via telephone, fax, internet, and/or email, on numerous occasions to further these fraudulent schemes.

157.    These willful, knowing, and intentional acts constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

Fraud in Foreign Labor Contracting: 18 U.S.C. § 1351

158.    As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, knowingly and with intent to defraud, recruited, solicited, and hired Plaintiffs and other Class members outside the United States for the purpose of employment in the United States by means of materially false or fraudulent

pretenses, representations, or promises regarding the nature of Plaintiffs' and other Class members' work and the wages they would receive.

159.    These willful, knowing, and intentional acts constitute fraud in foreign labor contracting in violation of 18 U.S.C. § 1351.

<u>Visa Fraud: 18 U.S.C. § 1546</u>

160.    As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, (a) knowingly subscribed as true multiple false statements with respect to material facts in the TN visa application materials required by immigration laws and regulations, and (b) knowingly presented the materials to Plaintiffs, other TN visa candidates, and U.S. visa-issuing authorities.

161.    The TN visas would not have been issued to Plaintiffs and others but for the false statements concerning the work to be performed by Plaintiffs and others at Defendants' facilities.

162.    These willful, knowing, and intentional acts constitute fraud and misuse of visas, permits, and other documents in violation of 18 U.S.C. § 1546.

<u>False Statements and Writings: O.C.G.A. § 16-10-20</u>

163.    As set forth in the preceding paragraphs, Defendants, through RICO Enterprise I, falsified Plaintiffs' and other Class members' wages and/or Social

Security numbers in submissions to the Georgia Department of Revenue, knowing the statements to the Georgia Department of Revenue were false.

164.    These knowing and willful acts constitute false statements and writings, in violation of O.C.G.A. § 16-10-20.

*Pattern of Related Racketeering Acts*

165.    The Defendants committed multiple acts of racketeering activity in furtherance of the fraudulent scheme recruit and employ Mexican engineers for non-existent jobs. O.C.G.A. § 16-14-3(4).

166.    The Defendants committed multiple acts of racketeering activity in furtherance of the fraudulent transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents. *Id.*

*Injury and Remedies*

167.    As a direct and proximate result of the Defendants' willful, knowing, and intentional acts discussed in this section, Plaintiffs and Class members have suffered and will suffer injuries to their property, including but not limited to visa processing fees, unreimbursed travel expenses, relocation expenses, housing-related expenses at the employer-provided apartments; purchase of tools required for their jobs; wage underpayments; tax preparer and/or accountant fees to

correct the misrepresentations and penalties associated with the late payment of taxes on the unreported wages; and/or other pecuniary losses.

168.    Plaintiffs have sustained actual damages, and Defendants acted with gross fraud, wantonness, maliciousness, and/or the willful disregard of the rights of others, such that Plaintiff and the Class are entitled to punitive damages.

169.    Plaintiffs and other Class members are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

      a.    Compensation for their actual damages, punitive damages, and trebling of these damages as authorized by O.C.G.A. § 16-14-6(c);

      b.    Injunctive relief as authorized by O.C.G.A. § 16-14-6(a) and (b).

      c.    Attorney's fees and costs and expert's fees and costs associated with this action as authorized by O.C.G.A. § 16-14-6(c).

**Count II**
**Breach of Contract**
**(Class Claim)**

170.    By this reference, Plaintiffs incorporate the above factual statements as if fully stated herein.

171.    This Count sets forth claims by Plaintiffs and other Class members for Defendants' breaches of contract for employment.

172.    Defendants breached their contracts with Plaintiffs and other similarly situated class members.

173.    As a direct consequence of Defendants' breach of contract, Plaintiffs and other similarly class members suffered economic injuries.

174.    Defendants are jointly and severally liable to Plaintiffs and other similarly situated class members for the damages that arose naturally and according to the usual course of things from Defendants' breach, as provided by O.C.G.A. § 13-6-2, and interest from the time of the breach until recovery, as provided by O.C.G.A. § 13-6-13.

175.    Because Defendants fraudulently induced Plaintiffs and other similarly situated workers to enter into similar contracts, Plaintiffs and other similarly situated workers are entitled to punitive damages in addition to consequential damages.

176.    Because Defendants acted in bad faith, Plaintiffs and other similarly situated workers are entitled to their expenses of litigation, including attorneys' fees and costs, under O.C.G.A. § 13-6-11.

## Count III
## Filing False Information Returns
### (Class Claim)

177.    By this reference, Plaintiffs incorporate the above factual statements as if fully stated herein.

178.    This Count sets forth claims by Plaintiffs and other Class members against Defendants for damages resulting from Defendants' violations 26 U.S.C. § 7434 (filing false information returns).

179.    As set forth above, the Defendants provided the IRS false information regarding Plaintiffs' and other Class members' Social Security wages on Defendants' quarterly and annual information returns, including on W-2 Forms, in an attempt to defraud the IRS.

180.    Plaintiffs and other Class members therefore are entitled, under 26 U.S.C. §7434(b), to recover the greater of either $5,000.00 for each false information return or damages Plaintiffs and other Class members sustained, the costs of this action, and reasonable attorney's fees.

181.    As required by 26 U.S.C. § 7434(d), Plaintiffs will provide a copy of this Amended Complaint to the Internal Revenue Service.

## Count IV
## FLSA Overtime
### (Collective Action Claim)

182.    By this reference, Plaintiffs incorporate the above factual statements as if fully stated herein.

183.    This count sets forth a claim by Plaintiffs, and by all similarly situated workers who opt into this action pursuant to 29 U.S.C. § 216(b), for damages resulting from Defendants' violations of the FLSA overtime requirements, 29 U.S.C. § 207.

184.    At all relevant times Defendants jointly employed Plaintiffs and all similarly situated workers at their Dalton recycling facility.

185.    Defendants were Plaintiffs' and all similarly situated workers' employers under the FLSA.

186.    The Plaintiffs and the other similarly situated workers regularly worked more than forty hours in a single work week.

187.    Defendants failed to pay Plaintiffs and other similarly situated workers overtime premiums at the rate of one-and-a-half times their regular rate of pay for every hour they worked above forty in a work week.

188.    Defendants' failure to pay an overtime premium based on their employees' regular rate of pay for hours above forty in a work week violated the FLSA, 29 U.S.C. § 207(a), and its implementing regulations.

189.    Defendants' violations of the overtime provisions of the FLSA were willful.

190.    The Plaintiffs and the other similarly situated workers are entitled to their unpaid wages, plus an additional equal amount in liquidated damages, as a consequence of Defendant's unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

191.    Plaintiffs and other similarly situated workers are also entitled to costs of Court, pursuant to 29 U.S.C. § 216(b).

192.    Plaintiffs and the other similarly situated workers also seek, and are entitled to, the attorneys' fees incurred by their counsel, pursuant to 29 U.S.C. § 216(b).

**Count V**
**FLSA Retaliation**
**(Individual Claim by Plaintiff Osvaldo)**

193.    By this reference, Plaintiffs incorporate the above factual statements as if fully stated herein.

194.    This count sets forth a claim by Plaintiff Osvaldo for damages resulting from Defendants' violations of the FLSA protections against retaliation, 29 U.S.C. § 215(a)(3).

195.    Plaintiff Osvaldo engaged in statutorily protected conduct when he complained to Defendants' management and human resources personnel that he was not paid proper overtime wages under the FLSA.

196.    Defendants retaliated against Plaintiff Osvaldo relating to the conditions of his employment for engaging in this protected conduct.

197.    Plaintiff Osvaldo is entitled to compensatory damages, plus an additional equal amount in liquidated damages, as a consequence of Defendant's unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b)

198.    Plaintiff Osvaldo is also entitled to costs of Court, pursuant to 29 U.S.C. § 216(b).

199.    Plaintiff Osvaldo also seeks, and is entitled to, the attorneys' fees incurred by his counsel, pursuant to 29 U.S.C. § 216(b).

## X.    Jury Demand

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury as to all issues so triable.

## XI.    Prayer for Relief

**WHEREFORE**, Plaintiffs respectfully request a jury trial and that this Court enter an Order:

a.  assuming jurisdiction over this action;

b.  declaring this action to be maintainable as a FLSA collective action pursuant to 29 U.S.C. § 216, allowing Plaintiffs to provide notice of this action to potential opt-in plaintiffs, and allowing those eligible workers who choose to do so to opt-in to this action;

c.  certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

d.  declaring that Defendants violated the Georgia RICO;

e.  declaring that Defendants breached their contracts with Plaintiffs and other Class members;

f.  declaring that Defendants violated 26 U.S.C. § 7434(d) (filing false information returns);

g. declaring that Defendants violated the FLSA overtime and anti-retaliation provisions;

h. permanently enjoining Defendants from further violations of the FLSA and Georgia contract law;

i. issuing injunctive relief as authorized by the Georgia RICO, O.C.G.A. § 14-14-6(a) and (b);

j. granting judgment to Plaintiffs and other Class members on their breach of contract claims and awarding them damages that arose naturally and according to the usual course of things from Defendants' breach, punitive damages, and interest from the time of the breach until recovery;

k. granting judgment to Plaintiffs and other Class members on their Georgia RICO claims and awarding them actual damages, punitive damages, trebling of these damages, and interest;

l. granting judgment to Plaintiffs and other Class members on their claims pursuant to 26 U.S.C. § 7434(d) and awarding them the greater of either $5,000.00 for each false information return or damages Plaintiffs and other Class members sustained;

m. granting judgment to Plaintiffs and other similarly situated workers who opt in pursuant to 29 U.S.C. § 216(b) on their FLSA claims and awarding each of them their unpaid wages plus an equal amount in liquidated damages, and awarding Plaintiff Osvaldo additional compensatory and liquidated damages for his FLSA retaliation claims;

n. Awarding Plaintiffs and other TN visa workers their costs and reasonable attorneys' fees; and

o. Granting such further relief as the Court finds just.

Respectfully submitted this day: March 31, 2023.

/s/ Daniel Werner
Daniel Werner
Georgia Bar No. 422070
dan@decaturlegal.com
James Radford
Georgia Bar No. 108007
james@decaturlegal.com
RADFORD & KEEBAUGH, LLC
315 W. Ponce de Leon Ave., Suite 1080
Decatur, Georgia 30030
Telephone: (678) 271-0300

/s/ Rachel Berlin Benjamin
Rachel Berlin Benjamin
Georgia Bar No. 707419
rachel@beal.law
Brian J. Sutherland
Georgia Bar No. 105408
brian@beal.law
BEAL SUTHERLAND BERLIN &
BROWN LLC
945 East Paces Ferry Rd NE
Suite 2000
Atlanta, GA 30326


/s/ Christopher B. Hall
Christopher B. Hall
Georgia Bar No. 318380
chall@hallandlampros.com
HALL & LAMPROS, LLP
300 Galleria Parkway, Suite 300
Atlanta, GA 30339

*Attorneys for Plaintiff*

<u>CERTIFICATE OF FONT AND SERVICE</u>

This is to certify that on March 31, 2023, I prepared the foregoing in Book Antiqua, 13-point type in accordance with L.R. 5.1(C) and that I electronically filed the document with the Clerk of Court using the CM/ECF system, which sent notification of such filing to all counsel of record.


<u>/s/ Daniel Werner</u>
Daniel Werner
Attorney for Plaintiffs